GRAYSON v. BRECKENRIDGE.

(Circuit Court of Appeals, Fifth Circuit. April 23, 1901.)

No. 946.

TRESPASS TO TRY TITLE—EVIDENCE OF TITLE CONSIDERED.

Plaintiff, as residuary devisee of a testator who died in 1838, brought action to recover certain lands in Texas, claimed by defendant. By his will the testator devised to two persons "all the lands held under title made to me, or secured to be conveyed to me by bond or otherwise, upon purchases made on our joint account in the years 1836 and 1837." Among purchases made by testator in 1836 was one from one Henry C. G. S., for

which a title bond was given, reciting full payment of the consideration. By a decree entered in 1843, in a suit by the devisees against the executors, the purchases included in the specific devise were determined and enumerated, and among others one stated to have been made from "William S."; but the purchase from Henry C. G. S. was not mentioned, and the executors were required to cause title to the tracts held by bond to be conveyed to such devisees. Subsequently the executors brought suit against Henry C. G. S., and in 1849 obtained a decree for the conveyance to them of the land embraced in his bond to testator. Defendant claimed title to a part of this tract, through mesne conveyances, under a deed to the same made by the devisees in 1851; and it was shown that he and his grantors had paid the taxes thereon since 1850, while plaintiff had paid no taxes thereon, nor made any claim thereto, until just prior to the commencement of the action. There was a William S. who owned a tract in the same county in 1836; but it did not appear that it had been purchased by testator, or that it was ever claimed by any one under him. By the law of Texas in force in 1836 a bond for a deed reciting payment of the consideration operated ·to convey the legal title to the purchaser, so that the will operated to pass title to the Henry C. G. S. tract directly to the devisees, provided the tract was embraced in the devise, although the effect of such bond was apparently misapprehended by the testator and all parties in interest, as well as by the court, which required the executors to procure conveyances in such cases. *Held* that, presumably, the court's decree through mistake used the name "William S.," instead of "Henry C. G. S.," in describing the tract intended to be assigned to the devisees, but that in any event it was clear, from all the evidence, that the tract in controversy was allotted to the devisees, either by the court or by agreement of the parties in interest, as being within the devise, and that the trial court did not err in directing a verdict for defendant.

In Error to the Circuit Court of the United States for the Western District of Texas.

Chas. W. Ogden, for plaintiff in error.

Leroy G. Denman, for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge. This was an action of trespass to try title to land. The pleadings are formal. The land, the title to which is involved in this suit, was granted by the government to Henry C. G. Summers. On April 13, 1836, Peter W. Grayson purchased the land from Summers, paying cash and receiving a bond for title. On the 8th of June, 1838, Grayson made and wrote with his own hand his last will and testament. The testator died in 1838, and his will was duly probated in Galveston county, Tex., on April 24, 1840. It has (with other provisions not necessary to note) the following:

"First. I give and bequeath to my three nephews, Frederick W. Grayson, John C. Grayson, and Alfred Grayson, and to my niece, Mary E. Breckenridge, now living in the United States, to be divided equally among them, all that I may be worth in lands or in other property, after the payment of my just debts and following legacies, namely: To Doct. Levi Jones, of Texas, and Albert T. Burnley, of Kentucky, I give and bequeath all the lands held under title made to me, or secured to be conveyed to me by bond or otherwise, upon purchases made on our joint account in the years 1836 and 1837. Said lands may be ascertained by writings under my hand executed to the aforesaid Burnley. * * * With respect to the lands hereby bequeathed to the said Jones and Burnley, I make this exception, and direct that a certain portion of them be conveyed to William M. Lambeth, of New Orleans, or any one he

may appoint to receive title to the same, their quantity and location to be ascertained by a writing which I have made to the said Lambeth, obligating myself to convey them to him. * * * Lastly. I hereby appoint my friends, Gail Borden, Jr., James Love, John Borden, and Oscar Farish, executors of this, my last will and testament."

Of the executors named Gail Borden, Jr., and John P. Borden duly qualified, and continued in charge of the estate of the testator certainly until the 26th day of September, 1845. How much longer the testimony does not show. On the day last named they brought suit in the district court for the county of Victoria against Henry C. G. Summers, in which they prayed that he may be compelled by a decree of the court to convey to the petitioners, as the representatives of Grayson, a good and indefeasible title to the land described in his bond for title. The plaintiff testified:

"Gail and J. P. Borden, executors of Grayson, had the estate in charge until about 1846. On May 25, 1843, the district court for Galveston county had rendered a decree, in a suit wherein Levi Jones and Albert T. Burnley were plaintiffs, and Gail Borden, Jr., and John P. Borden, executors of Peter W. Grayson, were defendants, in which it is recited that: 'This cause came on to be heard on the petition, answer, and the exhibits filed in the cause. Whereupon, it appearing to the satisfaction of the court * * * that the said plaintiffs are entitled to the lands specified, viz. all the lands purchased by said Peter W. Grayson of the following persons, to wit, James B. Miller, Leonard Manso, William Summers, Joseph McCoy, William Arrington, Valentine Garcia, Dugo Garcia, Samuel Williams, John Coffin and Sarah (his wife), and Thomas Jackson and wife, * * * and it also appearing that it was the intention of the said testator of the said defendants that they, as his executors, should convey the said lands to the plaintiffs, it is therefore adjudged, ordered, and decreed that the said defendants do convey, in their said characters of executors, to the said Jones and Burnley, all of the said lands so purchased as aforesaid by their said testator from the persons named, so far as they have made titles to them or their testator, and that so soon as titles can be procured of those lands so purchased as aforesaid, which were held by their said testator by title bonds or otherwise, that they convey the same or cause them to be conveyed by the original vendees of their said testator to the said plaintiffs; the conveyance by the said executors of the lands purchased from Leonard Manso to express that the said Levi Jones and Albert T. Burnley receive the title therefor without prejudice to the rights of William M Lambeth, before referred to in this decree and mentioned in said will.' "

It would seem from these proceedings that the testator, his devisees, and his executors, and the district court of Galveston county, were of opinion that title to the land did not pass by the execution and delivery of a bond for title and the payment of the purchase price. It is to be observed, further, that the will of the testator does not vest in his executors the title to the land he had purchased on joint account for himself and Jones and Burnley, but devises the same to, and vests the title thereto in, Jones and Burnley. The action of Grayson's executors against Henry C. G. Summers proceeded to judgment and decree by default on March 14, 1849, in which Summers was required to convey the land to the complainants by a good and indefeasible title. A. T. Burnley had executed and delivered his power of attorney to Levi Jones (June 23, 1845), authorizing him to sell and convey, by or with quitclaim warranty only, all the lands belonging to or claimed by Burnley situated in Texas. On September 7, 1851, Levi Jones, acting under power of attorney from Burnley,

conveyed to Fielding Jones (a brother of Levi Jones) the league of land (embracing the land in this suit) for a recited consideration of $5,000 in hand paid—

"To have and to hold the said tract or parcel of land, with all the privileges and appurtenances thereto belonging or in any wise appertaining, unto him, the said Fielding Jones, his heirs and assigns, forever. And the said Burnley hereby binds himself, his heirs, executors, and administrators, against the claim or claims of all persons whatsoever claiming the same, or any part thereof, under him or them, to warrant and forever defend; it being understood between the parties hereto that this conveyance is intended to be one in the nature of quitclaim only, the party purchasing being satisfied of the validity of the title of said Burnley."

The defendant shows a chain of title from Fielding Jones to himself, through mesne conveyances, for the land in controversy. The proof shows that the taxes were paid in 1850 by Levi Jones for Burnley on the entire Henry C. G. Summers league; that from 1852 to 1859, inclusive, Fielding Jones assessed and paid the taxes on the entire league; that from 1860 to 1866 J. S. Turner, under whom the defendant holds, assessed and paid the taxes on the entire league; that the persons in the defendant's chain of title have since annually assessed and paid the taxes on the land claimed by him in this action; and that the taxes on the balance of said league, since 1866, have been assessed and paid by various other persons claiming under Turner. There is no evidence tending to show that the plaintiff, or the executors of Grayson's will, or any one else acting for the plaintiff, had rendered this land for taxes, or paid taxes thereon at or for any time. There is no evidence tending to show that the plaintiff, or any person for him, asserted any title to the land in controversy until just before the bringing of this suit.

One of the attorneys for the plaintiff testified on the trial that during the 20 odd years he had lived in Lavaca county the plaintiff had claimed other land in the county, but not this land; that this witness was agent for the plaintiff under Judge W. P. Ballinger, and represented him in connection with the Muldoon land (owned by the plaintiff) and a number of these tracts in Lavaca county. Ballinger never told him to assert any claim to the land in controversy in this suit. Witness knew nothing about it. In reference to use and occupation this witness testified:

"It would be difficult for me to say how many people are living on the land. There are a number of people living there,—a dozen or more. Some of them have been living there a good while. I know that a number of them have been there quite a while. I do not know exactly the number of years."

He also testified:

"There is also in Lavaca county a William Summers survey. I do not think I can answer positively the question as to whether I have ever been able to trace any claim Grayson ever asserted to the William Summers survey. I could not give an idea as to how many people lived on the William Summers survey. It is a settled survey. I do not know anything about the title to the people who are living on the William Summers survey. I attended to what Judge Ballinger sent me in charge. I had no correspondence with him about this survey [Henry C. G. Summers]. He never intimated to me that his client claimed the Henry C. G. Summers survey. My agency with him was in connection with the Muldoon land. The Muldoon lands were not very valuable; worth about five or six dollars per acre."

## On cross-examination he testified:

"I do not know that I can make anything like a fair estimate as to what portion of the Henry C. G. Summers league is inclosed. Until recently most of it has been outlying. The principal part of this league was uninclosed prior to the institution of this suit. The people that lived on it were on small places,—small tracts,—and were poor people. I cannot say what portion of the league has been up to recently uninclosed, but a large portion. I could identify on the land the portion of the Henry C. G. Summers league which is claimed by the defendant. The portion of the league has not been occupied until recently."

## On re-direct examination he said:

"I did not represent any other land for the Grayson estate, except the Muldoon land. I frequently saw Judge Ballinger in connection with the Muldoon land, and he never mentioned any claim his client had for the land in controversy in this case."

We only notice the tenth assignment of error, which is to the effect that:

"The court below erred in peremptorily instructing the jury to return a verdict for the defendant, R. J. Breckenridge."

While the testator, his devisees and executors, and the district court of Galveston county seem to have concurred in the opinion that title to land did not pass by the execution and delivery of a bond for title and the payment of the purchase money, it is now, and has long been, settled law in Texas that a title bond (such as that from Summers to Grayson, dated April 13, 1836), showing upon its face that the purchase money had been paid, vested full title in Grayson under the law then in force. This erroneous view or the doubts then entertained by the parties interested in Grayson's estate, including Grayson himself, touching the character of his claim to lands held under such title bonds, aids us in the construction of the language of his will, and of the action of the court thereon and of the executors thereunder. The testator was a man of conspicuous prominence in Texas at and before the time of the making of his will and up to the time of his decease. The executors he appointed were leading historic figures in Texas in 1838. The two who qualified, Gail Borden, Jr., and John P. Borden, were most intimately acquainted with the whole subject of the grants and locations of lands in Texas, especially of surveys west of the Trinity river. As eminent lawyer and large planter, residing at Galveston and having his plantation in Brazoria county, Col. James Love was widely known, and enjoyed and deserved the esteem of the great majority of the residents in the Brazos and Colorado valleys. He was the uncle of Mr. William P. Ballinger, and on the organization of the state government after annexation was appointed the first district judge of the First judicial district of Texas, then including the county of Galveston and all of the counties on the Colorado below Bastrop and on the Brazos below Washington. His immediate predecessor was that helpful friend and worthy model for young lawyers, Judge John B. Jones. On the day that Mr. Ballinger enlisted for the Mexican War, though not then 21 years of age, Judge Jones, ex mero motu, issued to him his license to practice law, and, on Mr.

Ballinger's return from the war, admitted him into partnership with himself in the practice of law. From this auspicious entry into the legal profession Mr. Ballinger steadily grew in strength and reputation as a citizen and a lawyer, early attaining and ever holding his place in the highest rank. Dr. Levi Jones was one of the original, and perhaps the most active and the best known and most generally esteemed of the founders of the city of Galveston. He suffered business reverses in 1848, but his reputation for integrity, intelligence, and energy was never impaired. Fielding Jones was judge of the district court for the district which embraced the land involved in this case at the time the writer of this opinion came to the bar. One of the writer's earliest experiences as a lawyer was had as counsel for a party plaintiff in the trial of an action of trespass to try title to a league of land before that honorable and honored judge in the district court for Calhoun county, Tex. These are the men who were friends of the testator, connected with him in business and with each other in the faithful administration of his estate under his will.

The distinguished counsel who represents the plaintiff contends that the grant to Levi Jones and Albert T. Burnley is limited by this language in the will:

"Said lands may be ascertained by writings under my hand executed to the aforesaid Burnley."

The language of the devise is:

"I give and bequeath all the land held under title made to me, or secured to be conveyed to me by bond or otherwise, upon purchases made on our joint account in the years 1836 and 1837."

That is complete in itself, and the reasonable construction is that the lands purchased in 1836 and 1837 were purchased on joint account. It is to be remembered that on the 13th of April, 1836, the war between the Texas colonists (then provisionally organized as the republic of Texas) and the republic of Mexico was flagrant in the field where this land is situated. The Alamo had fallen, the little Texas army had retired from Gonzales across the Colorado, and then had crossed the Brazos, and all of the country west of the Brazos was fully occupied and being scoured by military forces hostile to the American settlers. These settlers, men, women, and children, had all retired, or were retiring, before the invading army. Nearly all of the men were in the retreating army. It was then that these purchases on joint account began. Many of them were doubtless made in the camp by patriots of strongest faith from patriots whose faith was shaken or lost. At that time, and for several years thereafter, extending beyond the time of the probate of Mr. Grayson's will, more than nine-tenths of all the land that had been granted and surveyed in that section of the country was entirely unoccupied by or for the grantees. It is not only reasonable to suppose, but almost absolutely certain, that most of the purchases made in the spring of 1836 by Mr. Grayson on joint account for himself and Jones and Burnley were made from persons who were leaving the country, or from those who did not then expect to be able to hold their lands. The vendors had been sparsely scattered over a wide

extent of territory, and their land grants were equally widely scattered. It does not appear on the face of the will, or anywhere in the record, whether the testator was at the time of making the will at his home in Texas, or was in the state of Kentucky. The proof shows that he died in Kentucky, in which state Mr. Burnley resided, and among the opening words of the will are these: "Feeling at the present moment the uncertainty of life." The fact is not mentioned in the record, but it is matter of public history that Mr. Grayson died by his own hand, and very soon after the date of the execution of this will.

The memorandum given to Mr. Burnley, and referred to in the will, would be useful to aid his executors and devisees in discovering the location of the different tracts of land constituting parts of his estate, and useful to Mr. Burnley to aid him in ascertaining the location of the lands purchased on joint account. It appears from the judgment in the case of Jones and Burnley against Grayson's executors that there were two exhibits attached to their petition,—one of which, marked "Exhibit B," appears to have been the "writings under my hand executed to the aforesaid Burnley," and the other, marked "Exhibit C," to have been the paper described in the will as "a writing which I have made to the said Lambeth, obligating myself to convey them [lands] to him," which has respect to the lands bequeathed to Jones and Burnley, and expresses a limitation thereon to the effect "that a certain portion of them be conveyed to William M. Lambeth, of New Orleans, or any one he may appoint to receive title to the same; their quantity and location to be ascertained by a writing which I have made to the said Lambeth." The petition and these exhibits thereto have been lost, but the judgment shows that Exhibit C embraced the one-fourth part of the lands purchased of Leonard Manso, and the judgment ordered and decreed that Grayson's executors convey to Jones and Burnley the lands purchased by their testator from the persons named in the decree, so far as they had made titles to them or their testator, and that, so soon as titles could be produced of those lands which were held by their testator by title bonds or otherwise, they convey the same, or cause them to be conveyed by the original vendees of their testator, to the plaintiffs,—the conveyance by the executors of the lands purchased from Leonard Manso to express that the said Levi Jones and Albert T. Burnley receive the title therefor without prejudice to the rights of William M. Lambeth, before referred to in the decree and mentioned in the will.

Among the parties named in the decree as those from whom purchases had been made by the testator on joint account appears the name of William Summers, and the name of Henry C. G. Summers does not appear. This decree was made on May 25, 1843. The minute entry of the judgment is all that now remains in existence of the record in that case. It may be that Mr. Grayson had known both Henry C. G. Summers and William Summers, and by inadvertence or lapse of memory wrote the wrong name in the memorandum of vendors which he gave to Mr. Burnley; or it may be that the parties to the suit of Jones and Burnley against Grayson's executors,

and the clerk who made the minute entry of the judgment, knew both William Summers and Henry C. G. Summers, and, without accurately comparing the entry of the names in the decree with the names in the memorandum, by oversight or inadvertence wrote the name of William Summers in the decree. However this may have been, what seems to us from the whole proof to be certain is that Jones, representing himself and Burnley, and the executors, representing impartially all the beneficiaries under the will of Grayson, made a classification and allotment of the lands bequeathed to the special devisees, and that in this adjustment and settlement the land purchased by the testator from Henry C. G. Summers was by them found to be a part of the lands purchased by the testator on joint account with Jones and Burnley, and was set aside to them and taken charge of by Jones as soon as the action by the executors on the bond for title, which was brought in 1845 in Victoria county, had proceeded to judgment; that he paid the taxes on the whole league for the year 1850, and that his vendee, Fielding Jones, paid the taxes on the entire league for the years 1852 to 1859, inclusive; that on February 1, 1859, Fielding Jones mortgaged the entire league to secure a loan of $2,000; that on May 4, 1860, he sold the entire league by general warranty to J. S. Turner; that Turner paid the taxes on the entire league from 1860 to 1866, and the defendant and those under whom he holds title have annually paid the taxes on the land involved in this case; that neither the plaintiff nor any person for him set up any claim to any part of the Henry C. G. Summers league of land until a short time before the filing of this suit. It is not shown that either he or any person for him paid taxes on any part of the Henry C. G. Summers league of land. It is shown that a league granted to William Summers, located in the same county, is, and for many years has been, fully occupied by numerous settlers. There is no evidence tending to show that the plaintiff, or any person for him, has ever claimed any part of the William Summers survey.

We refrain from any discussion of authority on the subject of the presumption of a grant, as, in our view, the learning on that subject has no application to this case. The proof satisfies us that a reasonable and impartial mind must conclude and presume therefrom that the league of land granted to Henry C. G. Summers, and by him sold by title bond in April, 1836, to the testator, was purchased by the testator on joint account for himself and Burnley and Jones, and that at some time prior to September 7, 1851, the date of the conveyance to Fielding Jones, this league had been duly allotted to the portion of lands devised to Jones and Burnley. We therefore conclude that the circuit court did not err in its instruction to the jury to find for the defendant. The judgment of the circuit court is affirmed.